[Civ. No. 18521.   Second Dist., Div. Two.   Mar. 26, 1952.]

SAM BLOCK et al., Appellants, v. THE BOARD OF PO-
LICE COMMISSIONERS OF THE CITY OF LOS
ANGELES et al., Respondents.

Wood, Crump, Rogers, Arndt & Evans and Morris W.
Young for Appellants.

Ray L. Chesebro, City Attorney, Donald M. Redwine, As-
sistant City Attorney, and Philip E. Grey, Deputy City At-
torney, for Respondents.

FOX, J.—In this mandate proceeding petitioners seek
to annul the action of the Board of Police Commissioners of
the city of Los Angeles revoking their junk dealer's permit,
which authorized them to carry on the scrap metal business.
The trial court denied them any relief.   They appeal from
that judgment.

On June 12, 1950, the board cited petitioners to show cause
why said permit should not be revoked upon the ground that

they had violated the provisions of section 24.01(g)(1)(2)(3) of the Los Angeles Municipal Code by reason of their alleged willful and unlawful failure to report to the police department, as required by said section of the municipal code, the purchase of 1,100 pounds of lead from one Ahrens, a chief petty officer of the Navy. The material was alleged in the order to show cause to have been stolen from the naval base on Terminal Island. It was further alleged that as a conseqence of said theft the navy officer had been held for court-martial by the naval authorities.

Hearings were held by the board on June 21, July 19, September 27 and October 4, all in 1950. At these hearings it was developed that Ahrens came into petitioners' place of business in a navy truck and that he was dressed in the navy fatigue uniform. Mr. Block, one of petitioners, told the board that he asked Ahrens if the lead was stolen and was advised by him that it was not; that "he got it from a blacksmith shop of surplus material; . . . from a blacksmith shop in the navy." The officer, however, testified that Ahrens admitted the theft. Ahrens used the name "Gray" in this transaction with petitioners. He did not furnish any identification. Mr. Block further stated to the board that Mr. Whitney, an investigator for the office of the United States Naval Intelligence, "asked me if I would return the lead to the Navy. I said 'Yes' and we returned the lead." It was stipulated that although Ahrens was ordered to stand trial before the United States Navy general court-martial at San Diego on certain charges, nevertheless the specifications involving this lead were voluntarily withdrawn and no prosecution on account of said specifications was conducted.

There was testimony before the board that petitioners had suggested to Ahrens that if the lead were melted down a higher price would be paid for it; also, testimony of an alleged bribery attempt of the police officers by one of them.

Affidavits were filed by petitioners denying both charges. However, the "Board did not read or consider all of said affidavits and the evidence therein set forth before making its order of revocation."

Petitioners admit that they did not make any report of the purchase of said lead to the Los Angeles Police Department as required by the municipal code.

Petitioners contend that they did not have a fair hearing before the board; that they were denied due process

of law; that the board acted arbitrarily in revoking their permit, and that the board discriminated against them and thereby denied them the equal protection of the law.

Petitioners base their charge of an unfair hearing on the part of the board and lack of due process on the failure of the board to fully read and consider the affidavits which they filed denying the alleged suggestion to Ahrens that if the lead were melted down a higher price would be paid therefor, and the alleged attempted bribery. It is obvious that the failure to read these affidavits could not prejudice petitioners' position with respect to the charge that they had failed to report the purchase of the lead to the police department, as required by the municipal code. They repeatedly admitted such failure. They claim, however, that the failure to read and consider these affidavits operated to their prejudice in the determination of the penalty, namely: that their permit should be revoked. This argument is based on sections 24.01(f) and 24.01(f)(1) which read:

"(f) Revocation of Permits. Any permit issued under the provisions of this Section may be revoked or suspended upon the grounds provided for in this Section:

"(1) Grounds. If persons holding permits under the provisions of this Section shall violate any of the provisions of this Section or any provision of any other ordinance, or any law relating to or regulating any such business, or shall conduct or carry on such business in an unlawful manner, the Board, in addition to any other penalties provided by this Code, shall revoke such permit issued to such person; . . ." They contend that the board was not required to revoke their permit upon their admitted violation of the section and argued to the board that they should only be subject to a reprimand. They point out that under subdivision (f) the board is granted discretion to revoke or suspend upon the grounds specified in the section, and that subparagraph (1), which states the grounds, provides only for revocation for violation of any of the provisions of the section; hence there are no stated grounds for suspension of a permit, with the result that the words "may be revoked or suspended" in subdivision (f) have no meaning or application. They further point out that some meaning should be given to each word or phrase in an ordinance and that this purpose can be accomplished by construing

the penalty provision in subparagraph (1) as discretionary rather than mandatory.

The complete answer to this argument is found in the further reading of said section 24.01. Subsection (p) subparagraph (1) provides that "In all cases where a claim is made to property . . . sold to a person holding a permit issued pursuant to this section, by a person claiming to be the owner thereof and asserting that the property was stolen, the Board shall, after a hearing upon notice, determine the validity of such claim and the immediate disposition which should be made as to the possession of the claimed property, . . . " Subparagraph 2 provides that "If the Board shall determine that such property was stolen, that the claimant is the owner thereof, and that there is no collusion between the claimant and the person by whom such property was stolen, the Board shall direct that such property be returned forthwith to the claimant without compensation" to him. Subparagraph 3 provides that in the event such direction to return the property to the rightful owner is disobeyed by the permittee the permit under which the party is conducting his business "may be revoked or suspended" by the board. It is thus apparent that this provision authorizes the exercise of discretion by the board in the particular situation. Meaning is thus given to the words "may be revoked or suspended" found in subdivision (f). The section first gives the general power to the board to revoke or suspend a permit for designated misconduct. It then expressly provides for revocation for certain offenses which include failure to report to the police purchases such as here involved, and for suspension or revocation if a permittee refuses to return property to the rightful owner. The language of the section is clear. There is no problem of construction. The section must be understood to mean exactly what it says. Consequently, when it was established by petitioners' admissions that they had violated the section by failing to make the required report to the police department, the penalty of revocation of their permit necessarily followed. So the denials of petitioners in their affidavits, that they were guilty of attempted bribery or that any of them had suggested that if the lead were melted down a higher price would be paid therefor, would be wholly immaterial in determining the penalty for their admitted violation because the municipal code fixes the penalty at revocation.

Petitioners contend the order revoking their permit must be annulled because it was "based upon both a technical violation and the erroneous belief that the lead was stolen." The failure to report purchases of used material to the police department as required by the ordinance is not just a technical matter. The city in the exercise of its police power had determined that the class of business in which petitioners were engaged "is one which requires constant police supervision" since such business furnishes "a market where thieves frequently seek to turn into cash their ill-gotten plunder." (*Cooperative Junk Co.* v. *Police Commrs.*, 38 Cal.App. 676, 679 [177 P. 308].) The seriousness with which such failure to report is regarded is indicated by the fact that the ordinance provides not only for the revocation of the permit but that a new permit may not be issued for six months.

■ Although the board made no express finding that the lead had been stolen such a "belief" would not necessarily have been "erroneous." Sergeant Waterman was asked by Mr. Young: "Did he (Ahrens) tell you he stole the material?" A. "Yes." It is true that Sergeant Waterman testified that this was his interpretation "of what Mr. Ahrens said or wrote." However, Ahrens' written statement, which was supposed to cover what he had stated orally, did not contain a specific admission of the theft of this lead. It is also significant in this connection that Ahrens used the name of Gray in making the sale to petitioners. There does not appear to be any reason for his using a fictitious name if he had acquired the lead honestly. This circumstance would justify an inference that it had been stolen. Furthermore, after the officers questioned petitioners regarding the purchase of the lead they returned it to the Navy. This conduct justifies an inference that petitioners came to the conclusion that Ahrens did not have a legal right to dispose of it. The credibility of the witnesses and the weight to be given the evidence were matters for the determination of the board. (*Southern Calif. Jockey Club* v. *California Horse Racing Board*, 36 Cal.2d 167, 177 [223 P.2d 1].) It is thus apparent that if the board did believe the lead was stolen, such belief would not be without substantial support.

Petitioners further contend that the board discriminated against them and denied them the equal protection of the law. They base this contention on the theory that the board takes no action against permittees who fail to re-

port unless the property purchased is claimed to be stolen. Petitioners are in no position to raise this proposition. At the outset of the trial it was stipulated that "In all proceedings since August 25, 1948, (the date of petitioners' permit) for the revocation of permits under section 24.01 of the Los Angeles Municipal Code, for the failure to report transactions, as required in said section, the property involved was allegedly stolen property." From the foregoing discussion it is plain that petitioners' case comes squarely within the policy and practice of the board, and that the manner of their treatment was not different from that of others similarly involved.

Petitioners also point out certain alleged irregularities in the proceeding before the board. None of these could possibly justify a reversal in view of petitioners' admissions and the express provisions of the ordinance.

From an examination of the entire record it is clear that petitioners had a fair hearing before the board and the trial court and that there is substantial evidence to support the findings essential to sustain the order and judgment.

The judgment is affirmed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied April 15, 1952, and appellants' petition for a hearing by the Supreme Court was denied May 22, 1952. Carter, J., was of the opinion that the petition should be granted.