[No. B014521. Second Dist., Div. Three. Oct. 9, 1986.*]

DONALD SCHRIVER, INC., Plaintiff and Appellant, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION et al.,
Defendants and Appellants.

*Review granted January 14, 1987. Review dismissed and opinion ordered published February 28,1991.

398

## COUNSEL

Thomas Keiser for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Marian M. Johnston and Louis Verdugo, Jr., Deputy Attorneys General, for Defendants and Appellants.

## OPINION

### ARABIAN, J.—

#### INTRODUCTION

Appellant and cross-respondent Donald Schriver, Inc. (appellant) appeals from the judgment of the superior court which denied its request, in its petition for writ of mandate (Code Civ. Proc., § 1094.5), to compel respondent and cross-appellant California Fair Employment and Housing Commission (Commission) to set aside the following determinations: (1) that appellant violated the California Fair Employment and Housing Act (the Act) (Gov. Code, § 12900 et seq.) by depriving Michelle Marie Ehlers of a harassment-free work environment and (2) that Ehlers was entitled to backpay and compensatory damages. The superior court granted appellant's petition only in the respect that it determined the Commission is not empowered to award punitive damages and ordered it to vacate and set aside its award of punitive damages to Ehlers. The Commission has cross-appealed from that portion of the superior court's determination.

#### PROCEDURAL BACKGROUND

On January 21, 1982, Ehlers filed a complaint with the California Department of Fair Employment and Housing (Department) alleging she was terminated from her job at Bahia Lodge (the Lodge) in Montebello, California, because she refused her supervisor's sexual advances and reported the harassment to the management of the Lodge. During the period of Ehlers's

employment at the Lodge, it was owned and operated by appellant, a corporation that builds, buys, manages, and sells a variety of income properties.

The Department filed an accusation, dated January 21, 1983, based upon Ehlers's complaint, charging the Lodge with violating the Act by harassing and terminating Ehlers on the basis of sex. An administrative hearing resulted in a proposed decision by the administrative law judge who found the accusation to be true and ordered Bahia Lodge to pay Ehlers backpay in the amount of $1,000 plus interest, compensatory damages of $5,000 for emotional distress, and punitive damages in the amount of $10,000.

The Commission did not adopt the proposed decision, but instead rendered its own decision on March 1, 1984, ordering appellant to pay Ehlers backpay in the amount of $12,599.28, compensatory damages for emotional injury in the amount of $7,500, plus punitive damages in the amount of $20,000, together with interest on these amounts. On April 25, 1984, appellant filed a motion for reconsideration; the motion was denied on May 9, 1984.

On June 6, 1984, appellant filed in the superior court a petition for writ of mandate (Code Civ. Proc., § 1094.5) and temporary stay, challenging the Commission's decision. Pursuant to the stipulation of the parties, the superior court issued an order staying enforcement of the Commission's decision pending the conclusion of the mandamus proceedings. The Commission answered the petition on April 9, 1985.

Following an April 18, 1985, hearing on appellant's petition, the court, exercising its independent judgment, ruled that the award of punitive damages was not within the authority of the Commission. The court struck the punitive damages award, but upheld the remainder of the Commission's order. This appeal and cross-appeal followed.

STATEMENT OF FACTS

At the administrative hearing, Ehlers testified that she began working at the Lodge as a day bartender in January of 1981. In addition to her daytime duties, Ehlers occasionally worked at night. The Lodge furnished its bartenders and waitresses with uniforms consisting of revealing short skirts and low tops with black and white ruffles.

In August or September of 1981, appellant hired Paul Petery as bar and restaurant manager of the Bahia Lodge. Shortly after his arrival, Petery began a pattern of persistent sexual conduct and advances towards Ehlers. He described himself to her as "Count Paul, the mad Hungarian lover," and bragged of his sexual exploits with other women.

Ehlers stated Petery would approach her in the bar, in his office, or in the restaurant kitchen, describe her body as a menu of dishes and tell her how he would prepare them. Ehlers testified she told Petery: "You can't be serious . . . . Why do you say these things? You're making me nervous Paul, would you just leave . . . . You're a nasty and rude person. My customers get upset at the way you speak to me, and you're supposed to be my supervisor."

Petery also invited Ehlers and Nancy Ruiz, a waitress at the Lodge, to a motel to watch a pornographic movie in which a headwaiter or a maitre d' forced half-naked waitresses to perform sexual acts for him. He told Ehlers on several occasions that "he had the power of the pen," and that "if [she wanted] pay, [she had] to play." Ehlers nevertheless rejected his invitation and advances.

Petery persisted in his rude behavior, and Ehlers spoke to Marie Mattic about these incidents. Mattic at that time worked under contract with appellant to oversee its bookkeeping. Ehlers told Mattic that she was upset about Petery's comments, but did not want to lose her job.

Mattic testified that she told Ehlers to speak with Ron McCain, the general manager of the Lodge. After Ehlers expressed reluctance to go to McCain, Mattic spoke with McCain and told him that Ehlers did not like Petery's comments.

McCain testified that Ehlers never approached him directly with a complaint about Petery. He stated, however, that Mattic told him Ehlers complained to her about "some sort of wisecracks" or comments Petery made to her.

Jerry Eugene Annan, who worked as a bandleader at the Lodge while Ehlers worked there, testified he sometimes heard Petery's suggestive comments to Ehlers. He also overheard Petery describe himself as the "great Hungarian lover."

Petery testified that he made comments to Ehlers in passing, but that his comments were brief. He stated that due to the all-male clientele of the bar, he felt his remarks were not objectionable as long as they were not overdone. He said he called himself "Count Paul, the mad Hungarian," but never the "mad Hungarian lover." Petery stated that, as the manager, he commented to Ehlers on her blouses, which he considered too low cut. He testified that in January of 1982, McCain spoke with him and warned him that it was not good policy to make suggestive comments to Ehlers. He said he stopped making the remarks after McCain spoke to him about Ehlers's complaints.

In mid-January 1982, shortly after Ehlers complained to Ron McCain about Petery's conduct, Ehlers was terminated from the Lodge. Petery claimed he fired Ehlers because she kept the money she received from bar customers instead of putting it in the cash register; she failed to charge customers for drinks; her children called her constantly at work; she sometimes spent the night at the Lodge with bar customers; and she failed to punch in and out.

Following her termination from the Lodge, Ehlers went to her doctor; from February of 1982, continuing through May 1983, she complained to him of insomnia and several physical problems. Ehlers's doctor testified that she seemed nervous and distraught and complained of fatigue.

CONTENTIONS

A.   Appellant contends on appeal:

1. The superior court erred in upholding the Commission's determination that appellant violated the sex discrimination prohibition of the Act, as the Commission's findings and conclusions were not supported by substantial evidence.

2. The superior court erred in upholding the Commission's award of compensatory damages and backpay to Ehlers, as the Commission's findings and determinations were not supported by substantial evidence.

B.   The Commission contends on cross-appeal:

1. The superior court erred in applying the independent judgment test, rather than the substantial evidence test, in reviewing the Commission's decision.

2. The superior court erred in concluding the Commission is not empowered to award punitive damages.

3. The Commission's award of punitive damages is supported by substantial evidence.

## DISCUSSION

### I. *The trial court erred in applying the independent judgment test to determine whether the Commission's findings were supported by the evidence.*[1]

■ The Commission contends the trial court erred in exercising its independent judgment, rather than the substantial evidence test, to determine whether the Commission's findings were supported by the evidence.

The Commission's ruling may be reviewed in the superior court by a petition for administrative writ of mandate (Code Civ. Proc., § 1094.5). (See *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 137-140 [93 Cal.Rptr. 234, 481 P.2d 242].) Under section 1094.5, if the order or decision of an administrative agency substantially affects a fundamental vested right, the superior court must exercise its independent judgment to determine whether the agency's findings are supported by the evidence. (*Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 143.) If, on the other hand, the order or decision of the agency does not involve or substantially affect a fundamental vested right, the superior court's inquiry is limited to a determination of whether the findings are supported by substantial evidence in light of the whole record. (*Id.,* at p. 144.)

In *Northern Inyo Hosp.* v. *Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14 [112 Cal.Rptr. 872], the Court of Appeal stated at page 23: "Applying Bixby guidelines, [the employer's] right to establish its employment practices and procedures and to impose conditions of employment can in no sense be termed a fundamental vested right. While the right to pursue a lawful business or occupation is a fundamental right [citing cases], there is no vested right to conduct a business free of reasonable governmental rules and regulations (see *Bixby* v. *Pierno, supra,* 4 Cal.3d 145-146; *Beverly Hills Fed. S. & L. Assn.* v. *Superior Court* [1968] 259 Cal.App.2d 306, 316-317 [66 Cal.Rptr. 183].)" (See also *American National Ins. Co.* v. *Fair Employment & Housing Com.* (1982) 32 Cal.3d 603, 607 [186 Cal.Rptr. 345, 652

---

[1] We address this contention first because it involves the appropriate standard of review in this case.

P.2d 1151]; *Kerrigan* v. *Fair Employment Practice Com.* (1979) 91 Cal.App.3d 43, 49-50 [154 Cal.Rptr. 29], cert. den. 444 U.S. 930 [62 L.Ed.2d 187, 100 S.Ct. 273].)

Under the foregoing guidelines, the superior court should have applied the substantial evidence test, not the independent judgment test, to review the evidence before the Commission. (See *American National Ins. Co.* v. *Fair Employment & Housing Com., supra,* 32 Cal.3d at p. 607.) We must determine, therefore, whether a different result is required under that standard. (See *Northern Inyo Hosp.* v. *Fair Emp. Practice Com., supra,* 38 Cal.App.3d at p. 23.) To that end, we must review the entire record to determine whether the Commission's findings and decision are supported by substantial evidence. (*Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 143, fn. 10; *Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 94 [84 Cal.Rptr. 113, 465 P.2d 1].)

"We may not isolate only the evidence which supports the administrative finding and disregard other relevant evidence in the record. (See *LeVesque* v. *Workmen's Comp. App. Bd.,* [1970] 1 Cal.3d 627, 638-639, fn. 22 [83 Cal.Rptr. 208, 463 P.2d 432]; Cal. Administrative Mandamus (Cont.Ed.Bar Supp. Jan 1974) § 5.75.) On the other hand, neither we nor the trial court may disregard or overturn the Commission's finding ' "for the reason that it is considered that a contrary finding would have been equally or more reasonable." ' (*Boreta Enterprises, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 2 Cal.3d 85, 94; *Bowman* v. *Alcoholic Bev. etc. Board,* [1959] 171 Cal.App.2d 467, 471-472 [340 P.2d 652].) [¶] ■ The ultimate issue in an administrative mandamus proceeding is whether the agency abused its discretion. An abuse of discretion is 'discretion exercised to an end or purpose not justified by and clearly against reason, all of the facts and circumstances being considered.' (*Brown* v. *Gordon,* [1966] 240 Cal.App.2d 659, 666-667 [49 Cal.Rptr. 901]; *Schaub's Inc.* v. *Dept. Alc. Bev. Control,* [1957] 153 Cal.App.2d 858, 866 [315 P.2d 459].)" (*Northern Inyo Hosp.* v. *Fair Emp. Practice Com., supra,* 38 Cal.App.3d at p. 24.)

Thus, we must uphold the Commission's decision unless our review of the entire record shows it is so lacking in evidentiary support as to render the decision unreasonable. (*Ibid.*; *County of Alameda* v. *Fair Employment & Housing Com.* (1984) 153 Cal.App.3d 499, 503 [200 Cal.Rptr. 381].) As we discuss in the following section of this opinion, here the evidence in the administrative record supports the Commission's determination that appellant violated the Act.

*II. The Commission's determinations, that appellant violated the Act by depriving Ehlers of a harassment-free work environment and terminating her because she resisted sexual harassment, is supported by substantial evidence in the administrative record.*

█ Appellant contends the trial court erred in upholding the Commission's decision because the evidence in the administrative record does not support the Commission's determinations that appellant violated the Act by (1) depriving Ehlers of a harassment-free work environment and (2) firing her because she refused Petery's sexual advances.

Government Code section 12940 provides in pertinent part:[2] "It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

"(a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, or sex of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions or privileges of employment."

The Commission, pursuant to section 12935, subdivision (a), interpreted section 12940, subdivision (a), to include within its prohibition sexual harassment. (§ 12940, subd. (i); Cal. Admin. Code, tit. 2, §§ 7287.6, subd. (b) & 7291.1, subd. (f)(1).)

The following evidence in the administrative record supports the Commission's determination that Ehlers was sexually harassed while she was employed at Bahia Lodge, and that she was fired for refusing the sexual advances of her former supervisor: Ehlers testified that Petery subjected her to unwarranted descriptions of his sexual conduct and graphic and degrading commentary on her body and the sexual use he would make of it. He often coupled his unwanted sexual advances with statements that compliance with his requests would make her job easier. He told Ehlers he had the "power of the pen" and that if she "wanted pay" she "had to play." Ehlers's account of Petery's conduct was confirmed by Jerry Eugene Annan, who worked as a bandleader at the Bahia Lodge.

---

[2] All statutory references hereafter are to the Government Code unless otherwise indicated.

Although Ehlers objected to Petery's advances and told him that his comments bothered her, he persisted in harassing her. Mattic confirmed that Ehlers complained to her about Petery's behavior and McCain testified that Mattic told him Ehlers was bothered by Petery's conduct. Although Petery testified that he fired Ehlers because she kept money received from bar customers; she failed to charge customers for drinks; her children called her constantly at work; she spent the night at the Lodge with bar customers; and she failed to punch in and out; there is substantial evidence that these factors were not the primary reasons Ehlers was fired.

The Commission stated in its decision: "[W]e conclude that [Ehlers'] response [to Petery's sexual advances] was at least the dominant, and more probably the sole cause of her termination. The claimed concerns with punching in and out, telephone calls, and nights spent at the motel, we think are nothing more than make-weight arguments, added at the hearing, that had no influence on Petery's actual decision. And we are convinced that the claims that complainant gave away drinks without authority and stole from [appellant], if they were real at all, would have entered into Petery's decision at most as partial and residual concerns, secondary to his dominant motive to retaliate against [Ehlers]. [¶] We think it far more likely, however, given the sequence of events, that these concerns were in fact pretexts on which Petery seized to get rid of an employee who had thwarted his advances and reported him."

We agree with the Commission's observations because there is substantial evidence in the administrative record which indicates that Petery sexually harassed Ehlers, thus depriving her of a harassment-free work environment, and then fired her because she not only rejected his sexual advances, but complained to others about his behavior.

Since Petery occupied a supervisory position at the Lodge, as the manager of the restaurant and bar facilities, appellant is responsible for his conduct in harassing and then firing Ehlers. (§ 12940, subd. (i); Cal. Admin. Code, tit. 2, §§ 7287.6, subd. (b)(2), 7291.1, subd. (f)(1), & 7286.6, subd. (b).) Accordingly, we conclude substantial evidence in the administrative record supports the Commission's determination that appellant violated the Act.

### III. *The Commission properly awarded Ehlers's backpay.*

■ Appellant contends the Commission's award of backpay to Ehlers should be "limited to the period from termination by Petery to her next job." Appellant argues that, although Ehlers correctly mitigated damages

by regaining employment, the fact that she subsequently lost her job at the Roadway Motel where she worked following her dismissal from the Lodge, should not "reopen appellant's liability."[3]

"The burden of proving a failure to mitigate damages in an employment discrimination suit is on defendant. *Kaplan* v. *Intern. Alliance of Theatrical, etc.* 525 F.2d 1354, 1363 (9th Cir. 1975). To satisfy this burden, defendant must establish (1) that the damage suffered by plaintiff could have been avoided, i.e., that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position." (*Sias* v. *City Demonstration Agency* (9th Cir. 1978) 588 F.2d 692, 696, italics in original.)

In its decision, the Commission acknowledged that Ehlers would not be entitled to a backpay award if, in fact, she had been legitimately discharged from suitable employment for misconduct following her termination at the Lodge. The Commission stated: "[Appellant] has the burden of demonstrating, by a preponderance of all the evidence, that a discrimination complainant has failed adequately to mitigate her loss of income by seeking or keeping subsequent employment that was suitable and available for which the complainant was qualified. . . . Thus if a complainant claiming a discriminatory discharge or failure to hire later finds suitable employment but is then legitimately discharged from it for misconduct, the complainant has failed to exercise due care to limit his wage losses and we will limit the back pay award accordingly."

The Commission concluded that appellant "has not carried its burden of demonstrating such failure to mitigate in this case." The Commission added that "to determine that complainant was responsible for the loss of her job we must be convinced that she did in fact take drink money from the Roadway Motel, as [appellant] claims. *The only evidence on this point in the record, however, is complainant's testimony that the manager of the Roadway told complainant that a customer had told the manager that complainant had not put money she had received for drinks in the cash register. We find this evidence, which is double hearsay in form and uncorroborated by any witness from the Roadway or any admission by complainant, far too thin to support a conclusion that complainant did in fact steal. The back pay period thus extends beyond complainant's departure from the Roadway, and with-*

---

[3] The Commission is authorized to award backpay pursuant to section 12970, subdivision (a), section 12920, and California Administrative Code, title 2, section 7286.9, subdivision (a).

*out offset for the amounts she might have continued to earn there.*" (Italics added.)

Inasmuch as substantial evidence in the administrative record supports the Commission's determination that appellant failed to meet its burden of proving Ehlers did not mitigate her damages, we conclude the Commission correctly refused to limit Ehlers' award of backpay to the date of her termination from her subsequent employment following her firing from the Lodge.

### IV. *The Commission improperly awarded Ehlers compensatory and punitive damages.*

■  The Commission contends the trial court erred in concluding the Commission is not empowered to award punitive damages and urges also that its award of punitive damages to Ehlers is supported by substantial evidence.

Appellant, in turn, challenges the sufficiency of the evidence supporting the award of compensatory damages.

The preliminary inquiry, i.e., whether the Commission can award compensatory and punitive damages as an administrative remedy, was reserved by the Supreme Court in *Commodore Homes Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 215 [185 Cal.Rptr. 270, 649 P.2d 912]. (*State Personnel Bd.* v. *Fair Employment & Housing Com.* (1985) 39 Cal.3d 422, 429; see 434, fn. 12 [217 Cal.Rptr. 16, 703 P.2d 354].)

The issue whether the Commission has authority to grant compensatory damages is currently before our Supreme Court in *Peralta Community College Dist.* v. *Fair Employment & Housing Com.* (1986) 181 Cal.App.3d 1065 [226 Cal.Rptr. 794] review granted August 21, 1986 (25047). And, the issue whether the Commission has authority to award punitive damages is currently before our Supreme Court in *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* ■ (Cal.App.).

With knowledge that these issues are under consideration by the Supreme Court, we very briefly offer our view.

The express purpose of the Act, as spelled out in section 12920,[4] is "to provide effective remedies" which will eliminate such discriminatory practices in employment that are contrary to the public policy of the state. (See *Commodore Home Systems, Inc.* v. *Superior Court, supra,* 32 Cal.3d 211, 220.)

Section 12970, subdivision (a), authorizes the Commission to fashion a defined number of remedies for unlawful employment practices:

"If the commission finds that a respondent has engaged in any unlawful practice under this part, it . . . shall issue and cause to be served on the parties an order requiring such respondent . . . to take such action, *including, but not limited to,* hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any respondent labor organization . . . ." (Italics added.)

Subdivision (a) of section 12970 then goes on to give the Commission power to take action that in their judgment "will effectuate the purposes" of the Act. Despite the seeming paradox of the section's broad general language and its narrow equitable remedies, we cannot conclude the Commission is authorized to award compensatory and punitive damages absent *specific* legislative language granting such authority. We consider judicial legislation to allow such awards inappropriate.

The words "including, but not limited to" in subdivision (a) of section 12970 relate to matters which immediately impact upon the employee, e.g., "hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any . . . labor organization." These equitable remedies, and others which may be fairly implied, are within the Commission's authority. However, one could not seriously argue that in a

---

[4] Section 12920 provides: "It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, religious creed, color, national origin, ancestry, physical handicap, medical condition, marital status, sex, or age.

"It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment for such reasons foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general.

"Further, the practice of discrimination because of race, color, religion, sex, marital status, national origin, or ancestry in housing accomodations is declared to be against public policy.

"It is the purpose of this part *to provide effective remedies* which will eliminate such discriminatory practices.

"This part shall be deemed an exercise of the police power of the state for the protection of the welfare, health, and peace of the people of this state." (Italics added.)

judgment which seeks to remedy discriminatory and unlawful sexual harassment, such as found here, the Commission could order sterilization, castration or lobotomy. These remedies are certainly outside the spirit and sense of the law. So too, in our opinion, are monetary awards in the form of compensatory and punitive damages.

"Does not everybody see from hence, that you must first examine the law before you can apply the rule of construction? For the law must not be bent by the construction, but that must be adapted to the spirit and sense of the law." (Lord Camden, C. J., *Entick* v. *Carrington* (1765) 19 How. St. Tr. 1029, 1060.)

There exist two paths to relief for the aggrieved under the Act—one administrative and the other judicial in nature. (*Commodore Home Systems, Inc.* v. *Superior Court, supra,* 32 Cal.3d at p. 217; § 12965, subd. (b).) Our Supreme Court has held that all relief generally available in noncontractual civil actions is within the reach of one who selects the judicial remedy when the Department declines to pursue an administrative claim in his behalf. (*Commodore Home Systems, Inc.* v. *Superior Court, supra,* 32 Cal.3d at pp. 220-221.) We believe the Legislature did not intend that such broad judicial relief be available, as well, in an administrative forum.[5]

## CONCLUSION

Professor C. MacKinnon in her book on sexual harassment and discrimination draws a distinction between that harassment which creates an offensive environment ("condition of work") and harassment in which a supervisor demands sexual consideration in exchange for job benefits ("quid pro quo").[6]

Here, the complained of conduct, which was offensive, intimidating, threatening and oppressive, was a combination of both forms of harassment. ▮ An employer may not, through sexually oriented remarks,

---

[5] A number of other state courts have also concluded that statutes similar to the Act do not authorize the nonjudicial award of compensatory or punitive damages. (E.g., *Ohio Civil Rights Commission* v. *Lysyj* (1974) 38 Ohio St.2d 217 [313 N.Ed.2d 3, 6-7, 70 A.L.R.3d 1135]; *Gutwein* v. *Easton Publishing Company* (1974) 272 Md. 563 [325 A.2d 740, 743-747], cert. den. (1975) 420 U.S. 991 [43 L.Ed.2d 673, 95 S.Ct. 1427]; *Mendota Apts.* v. *District of Columbia Com'n on H.R.* (D.C.App. 1974) 315 A.2d 832, 834-836; *Zamantakis* v. *Commonwealth Human Rel. Com'n.* (1973) 10 Pa.Commw. 107 [308 A.2d 612, 616].)

[6] MacKinnon, Sexual Harassment of Working Women (1979) pages 32-34; see Kay & Brodsky, *Protecting Women from Sexual Harassment in the Workplace* (1980) 58 Texas L. Rev. 671, 679.

create an offensive workplace and, likewise, may not require sexual consideration from an employee as a quid pro quo for job benefits or continued employment. The Act is intended to eliminate such predatory exploitation of a worker who is relatively defenseless, but whose spirit likely longs for the tranquility of human respect.

We believe in a policy of protection for such persons under a deep seated conviction that the evil the Act is intended to remedy in fact exists and that its provisions are well adapted to curtail and check its presence.

### DISPOSITION

That portion of the superior court's judgment which upheld the Commission's award of compensatory damages to Ehlers is reversed and the Commission is ordered to vacate and set aside such award. In all other respects, the judgment of the superior court is affirmed. The parties are to bear their own costs on appeal.

Danielson, Acting P. J., and Herrington, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.